**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| DANIEL SALINAS, Derivatively on Behalf of Nominal Defendant BARRETT BUSINESS SERVICES, INC., | ) ) ) |
| | ) Case No. |
| Plaintiff, | ) |
| | ) |
| v. | ) **VERIFIED STOCKHOLDER** ) **DERIVATIVE COMPLAINT** |
| | ) |
| JAMES D. MILLER, | ) |
| | ) JURY DEMAND |
| Defendant, | ) ) |
| and | ) |
| | ) |
| BARRETT BUSINESS SERVICES, INC., | ) |
| | ) |
| Nominal Defendant. | ) |

Plaintiff Daniel Salinas ("Plaintiff"), by and through his undersigned attorneys, submits this Verified Stockholder Derivative Complaint (the "Complaint") against the defendants named herein, and alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, a review of the Company's public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases and reports, and investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

## **NATURE OF THE ACTION**

1.      Plaintiff brings this stockholder derivative action on behalf of nominal defendant Barrett Business Services, Inc. ("BBSI" or the "Company") against the Company's former Chief Financial Officer ("CFO"), Treasurer, Secretary, and Vice President of Finance James D. Miller

COMPLAINT
*SALINAS V. MILLER, ET AL.*
-1-
**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

("Miller"), for breaches of duty, unjust enrichment and other violations of law which have caused BBSI to sustain damages.

2.      BBSI provides business management solutions for small- and mid-sized companies. The Company operates business segments: 1) Professional Employer Organization Services ("PEO"); and (2) Staffing.

3.      In the PEO segment, BBSI provided workers' compensation coverage through the various services agreements that the Company executes with its clients.  As a provider of workers' compensation coverage, BBSI was required to maintain workers' compensation reserves sufficient to meet the obligations the Company owes to its clients' employees.

4.      Managing the Company's workers' compensation exposure was critical to BBSI's financial well-being.  As one of the Company's largest liabilities, BBSI's workers' compensation reserves had a direct effect on the Company's profitability.

5.      From 2012 through 2014, Defendant Miller engaged in several fraudulent accounting practices to mask negative trends in BBSI's workers' compensation exposure, including: (1) misclassifying expenses to understate BBSI's workers' compensation expense; (2) improperly recognizing certain federal and state unemployment tax expenses; and (3) underreporting BBSI's workers' compensation liability by, among other things, concealing the existence of a second actuarial report that corroborated BBSI's actuary's belief that BBSI needed to increase its workers' compensation liability by $80 million.

6.      As a result of this misconduct, the U.S. Department of Justice ("DOJ") and SEC investigated BBSI and Defendant Miller for violations of federal law.  On September 19, 2018, the DOJ commenced a criminal proceeding against Miller by issuing an indictment ("Indictment") charging Miller with four criminal violations for certification of a false financial report (the "DOJ Action").[1]   The Indictment alleged that Miller "knowingly and willfully certified falsely that the periodic reports fully complied with the requirements of Sections 13(a) and 15(d) of the Securities Exchange Act of 1934 and that the periodic reports fairly presented, in all material respects, the

---

[1] A true and correct copy of the Indictment is attached hereto as Exhibit A.

financial condition and results of operations of BBSI, despite knowing that these certifications were false . . . ."  The following day, the SEC commenced a civil proceeding against Miller by filing a complaint alleging facts similar to those set forth in the Indictment (the "SEC Complaint"),[2] and issued a cease-and-desist order against BBSI and the Company's former controller (the "SEC Order").[3]

7.      On November 2, 2018, BBSI filed a complaint against Defendant Miller to recoup costs and expenses the Company advanced Miller under the terms of an indemnification agreement (the "BBSI Complaint").[4]  According to the BBSI Complaint, "[a]s CFO of BBSI, Miller engaged in a number of improper accounting practices related to BBSI's workers' compensation liability expense."  The Company also asserted that: "Miller's admissions, the indictment in the DOJ Action, and the findings in the SEC Order establish that Miller acted with bad faith or active or deliberate dishonesty in committing acts that gave rise to the SEC investigation," and that Defendant Miller received improper benefits through his "receipt of bonuses and other incentive-based compensation between 2012 and 2014, and through the sale of BBSI stock in 2013."

8.      Defendant Miller's misconduct constituted a breach of his duties to the Company.  As a result of Miller's breaches of duty, BBSI has sustained damages, including, without limitation, the costs and expenses incurred in connection with (1) internal and government investigations; and (2) the restatement and remediation of myriad material weaknesses relating to the Company's reserve practices and internal controls over financial reporting.  While the Company suffered, Defendant Miller was able to profit handsomely through sales of BBSI common stock and his receipt of substantial and unwarranted performance-based compensation and bonuses.

9.      After having made a demand to the Company's Board of Directors (the "Board") to take action, and having that demand refused (as described below), Plaintiff brings this action to recover from Defendant Miller the damages the Company has sustained as a result of the misconduct alleged herein.

---

[2] A true and correct copy of the SEC Complaint is attached hereto as Exhibit B.

[3] A true and correct copy of the SEC Order is attached hereto as Exhibit C.

[4] A true and correct copy of the BBSI Complaint is attached hereto as Exhibit D.

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

11.     The Court has personal jurisdiction over both Defendants because they are either a corporation conducting business and maintaining operations in this District, or an individual who is either present in this District or maintains sufficient minimum contacts to render jurisdiction in this District appropriate.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, as a substantial portion of the transactions complained of herein occurred in this District.  Additionally, Defendants have received compensation in this District and/or conducted business and maintained offices within this District.

## PARTIES

13.     Plaintiff is an owner of BBSI common stock and has owned BBSI common stock continuously since prior to the wrongs complained of herein.  Plaintiff is a citizen of Texas.

14.     Nominal defendant BBSI is a Maryland corporation with its principal place of business located at 8100 NE Parkway Drive, Suite 200, Vancouver, Washington 98662.  BBSI is thus a citizen of Washington and Maryland.

15.     Defendant Miller served as CFO, Treasurer, Secretary, and Vice President of Finance of BBSI from June 2008 to March 4, 2016.  Miller joined the Company in January 1994 as Controller.  Miller is a citizen of Washington.

16.     Defendant Miller and nominal defendant BBSI are collectively referred to herein as the "Defendants."

## MILLER'S DUTIES

17.     By reason of his position as an officer of the Company and because of his ability to control the business and corporate affairs of the Company, Defendant Miller owed the Company and its stockholders the obligations of good faith, loyalty and candor, and was required to use his utmost ability to control and manage the Company in a fair, just, honest and equitable manner.  Miller was

COMPLAINT
SALINAS V. MILLER, ET AL.
-4-
TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of his personal interest or benefit. Each officer of the Company owes to the Company and its stockholders the duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

18.     To discharge his duties as an officer of the Company, Defendant Miller was required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, Miller was required to, among other things:

a.      Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business;

b.      Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.      Exercise good faith to ensure that the statements made to the public by Miller, through the Company, were not materially false and/or misleading; and

d.      Refrain from wasting the Company's assets or otherwise unduly benefiting themselves and other Company insiders at the expense of the Company.

19.     Defendant Miller was further required to comply with the Company's Code of Business Conduct (the "Code of Conduct"). The Code of Conduct "demand[ed] that [the Company's] employees, officers and directors conduct business in accordance with the highest standards of integrity and personal and professional ethics . . . ." The Code of Conduct stated that BBSI "[sought] to uphold the highest professional standards in [its] business operations[,]" and that the Company "believe[d] that [it] must pay constant attention to all legal boundaries and comply with all applicable laws and regulations in all operations."

20.     Under the Code of Conduct, Defendant Miller was required to "[c]omply with laws, rules and regulations and all internal policies and procedures . . . ." With regard to insider trading, the Code of Conduct stated that:

Employees must at all times comply with state and federal laws and Barrett's internal policies relating to insider trading. If an employee has material, non-public information relating to Barrett or its business, the employee, his or her family members, and any entities controlled by the employee or his or her family

members may not buy or sell Barrett's securities or engage in any other action to take advantage of, or pass on to others, that information.

21.     The Code of Conduct also emphasized the "critical importance" of the Company's financial reporting responsibilities.  Specifically, the Code of Conduct stated that:

> [I]t is of critical importance that Barrett's filings with the Securities and Exchange Commission ("SEC") and other public disclosures be accurate and timely. Depending on his or her position, an employee may be called upon to provide information to assure that Barrett's public reports are complete, fair and understandable. Barrett expects all of its personnel to take this responsibility very seriously and to provide prompt, accurate and complete answers to inquiries related to our public disclosure requirements.

> Our accounting department bears a special responsibility for promoting integrity throughout the organization. Our chief executive, principal financial and principal accounting officers (collectively, "Senior Financial Officers") are expected to adhere to and promote compliance with this Code of Business Conduct and ensure that a culture exists throughout the company as a whole that facilitates the fair and timely reporting of Barrett's financial results and condition.

22.     Accordingly, Defendant Miller, because of his position of control and authority as an officer of the Company, was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

## SUBSTANTIVE ALLEGATIONS

**Background of BBSI**

23.     BBSI is a provider of business management solutions for small- and mid-sized companies.  The Company operates two business segments: PEO and Staffing.  In the PEO segment, BBSI provides payroll, payroll taxes, workers' compensation coverage and certain other administrative functions for its clients.

24.     In the PEO segment, BBSI provides workers' compensation coverage through the various services agreements that the Company executes with its clients.  As a provider of workers' compensation coverage, the applicable statutory requirements require, among other things, that BBSI maintain workers' compensation insurance or otherwise demonstrate a financial responsibility to meet the workers' compensation obligations the Company owes to its PEO client's employees.

25.     Historically, BBSI self-insured its workers' compensation liability in many states and operated a captive insurance subsidiary to assist in managing these liabilities.  In order to comply with state insurance regulations, BBSI maintained reserves that could be drawn upon to make

payments on workers' compensation claims.  The reserve was maintained at a level commensurate with BBSI's workers' compensation liability on its balance sheet.

26.     Every quarter, from the first quarter ended March 31, 2009 through the third quarter ended September 30, 2014, BBSI retained actuary Richard E. Sherman ("Sherman") to estimate the Company's workers' compensation liability.  BBSI set its workers' compensation reserves based on: 1) reported claims ("Case Reserves"); and 2) incurred but not reported losses ("IBNR") and potential future increases in the cost of reported claims ("Adverse Loss Development") (together, IBNR and Adverse Loss Development are hereinafter referred to as "Total IBNR").  BBSI's calculation of its workers' compensation liabilities reflected: 1) an evaluation of information provided by the Company's internal claims adjusters and third-party administrators; and 2) an actuarial estimate of IBNR and Adverse Loss Development developed by Sherman as the Company's actuary.  BBSI reflected the accumulation of reserves in its financial statements by accruing liabilities to reflect the overall amount of unsettled insurance claims and recognizing periodic expenses on its income statement to reflect the quarterly cost of funding the reserve.

27.     During quarterly and year-end closing processes, Sherman provided BBSI with a report estimating the Company's overall workers' compensation liability.  Until the first quarter of 2014, BBSI used an actuarially-derived estimate as the basis for the workers' compensation liability reflected on the Company's balance sheet.

28.     Managing the Company's workers' compensation exposure was critical to BBSI's financial well-being.  As one of the Company's largest liabilities, BBSI's workers' compensation reserves have a direct effect on the Company's profitability.  That is, any increase in workers' compensations reserves results in increased expenses, which correspondingly decreases gross margin, income from operations, income before taxes, net income and earnings per share and vice versa.

29.     As a member of BBSI management, Defendant Miller played an integral role in setting the Company's workers' compensation liabilities.  Indeed, the Company acknowledges in its public filings that "[r]eserve amounts are based on management's estimates," and that "[m]anagement's internal accrual process for workers' compensation expense is based upon the immediate recognition of an expense and the related liability at the time a claim occurs[.]"  The

Company has also routinely acknowledged in its public filings that its workers' compensation liabilities reflect BBSI management's "best estimates."

**Miller Misrepresents In BBSI's Public Filings That Its Workers' Compensation Reserves Were Adequate**

30.     In public filings with the SEC in fiscal years 2012, 2013, and 2014, Defendant Miller regularly represented that the Company's workers' compensation reserves were adequate when, in reality, Miller knew that BBSI's reserves were substantially understated.

31.     On March 15, 2012, BBSI filed with the SEC its 2011 10-K, which was signed by Defendant Miller.  The 2011 10-K described the process by which the Company sets its workers' compensation reserves as follows:

> We recognize our liability for the ultimate payment of incurred claims and claims adjustment expenses by accruing liabilities which represent estimates of future amounts necessary to pay claims and related expenses with respect to covered events that have occurred. ***When a claim involving a probable loss is reported, our internal claims management personnel or our TPA [third party claims administrator] establishes a case reserve for the estimated amount of ultimate loss***. The estimate reflects an informed judgment based on established case reserving practices and the experience and knowledge of our claims management staff and the TPA regarding the nature and expected value of the claim, as well as the estimated expense of settling the claim, including legal and other fees and expenses of administering claims. The adequacy of such case reserves in part depends on the professional judgment of both our claims management staff and our TPA to properly and comprehensively evaluate the economic consequences of each claim. Our reserves include an additional component for both estimated future adverse loss development in excess of initial case reserves on open claims and for incurred but not reported claims (together IBNR) based upon an actuarial estimate provided by the Company's independent actuary. Our reserves do not include an estimated provision for the incidence of unknown or unreported catastrophic claims.
>
> As part of the case reserving process, historical data is reviewed and consideration is given to the anticipated effect of various factors, including known and anticipated legal developments, inflation and economic conditions. Reserve amounts are based on management's estimates, and as other data becomes available, these estimates are revised, which may result in increases or decreases in existing case reserves. Management's internal accrual process for workers' compensation expense is based upon the immediate recognition of an expense and the related liability at the time a claim occurs; the value ascribed to the expense and liability is based upon our internal claims management and the TPAs' estimate of ultimate claim cost coupled with a provision for estimated future development based upon an actuarial review performed quarterly by our independent actuary. ***We believe our total accrued workers' compensation claims liabilities at December 31, 2011 are adequate.*** It is possible, however, that our actual future workers' compensation obligations may exceed the amount of our accrued liabilities, with a corresponding negative effect on future earnings, due to such

COMPLAINT
*SALINAS V. MILLER, ET AL.*

-8-

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

factors as unanticipated adverse loss development of known claims and, to a much lesser extent, of claims incurred but not reported.

(Emphasis added).

32.     On March 15, 2013, BBSI filed with the SEC its Annual Report on Form 10-K for fiscal year 2012 (the "2012 10-K"), which was signed by Defendant Miller.  The 2012 10-K described the process by which the Company set its workers' compensation reserves and the adequacy of those reserves in language substantially similar to that of the 2011 10-K.  The 2012 10-K also stated that the Company's internal controls over financial reporting were effective as of December 31, 2012. Note 6 to the financial statements reported in the 2012 10-K disclosed that the Company's workers' compensation reserve for the quarter was $70.6 million, consisting of  Total IBNR of $48.0 million and Case Reserve of $22.6 million.

33.     On May 9, 2013, BBSI filed with the SEC a Form 10-Q for the quarter ended March 31, 2013 ("First Quarter 2013 10-Q"), which was signed by Defendant Miller.  Note 5 to the financial statements reported in First Quarter 2013 Form 10-Q disclosed that the Company's workers' compensation reserve for the quarter was $77.2 million, consisting of Total IBNR of $51.8 million and Case Reserve of $25.4 million.  The First Quarter 2013 10-Q stated that there had been no changes in the Company's internal controls over financial reporting during the period.

34.     In July 2013, BBSI commissioned a study regarding the adequacy of reserve levels for claims incurred in prior years.  These efforts led the Company later that year to conduct reserve study on workers' compensation claims dated 2012 and earlier.  Defendant Miller and other BBSI executives would later describe this process as a "reserve strengthening."

35.     On August 8, 2013, BBSI filed with the SEC a Form 10-Q for the quarter ended June 30, 2013 ("Second Quarter 2013 10-Q"), which was signed by Defendant Miller.  Note 5 to the financial statements reported in Second Quarter 2013 Form 10-Q disclosed that the Company's workers' compensation reserve for the quarter was $84.5 million, consisting of Total IBNR of $56.4 million and Case Reserve of $28.1 million.  The Second Quarter 2013 10-Q contained disclosures regarding the Company's internal controls over financial reporting that were similar to the disclosures contained in the First Quarter 2013 10-Q.

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

36.     On February 4, 2014, BBSI issued a press release entitled "BBSI Reports Fourth Quarter and Full Year 2013 Financial Results" (the "February 4, 2014 Press Release").  The next day, BBSI hosted a conference call to discuss the February 4, 2014 Press Release.  During that call, BBSI disclosed for the first time the existence of its so-called "reserve strengthening" process.

37.     On March 14, 2014, BBSI filed with the SEC its Annual Report on Form 10-K for fiscal year 2013 (the "2013 10-K"), which was signed by Defendant Miller.  The 2013 10-K described the process by which the Company set its workers' compensation reserves and the adequacy of those reserves in language substantially similar to that of the 2011 10-K and 2012 10-K.  The 2013 10-K also stated that as of December 31, 2013, the Company's estimated future liability for unsettled workers' compensation claims liabilities was $112.4 million, consisting of Total IBNR of $69.6 million and Case Reserve of $42.8 million.  The 2013 10-K further represented that the Company's internal controls over financial reporting were effective as December 31, 2013.

38.     According to the SEC Order and SEC Complaint, by early 2014, Sherman began reporting to the Company that he anticipated a massive increase in the Company's workers' compensation liability.  Specifically, "[a]t the end of the first quarter of 2014," Sherman estimated workers' compensation liabilities would need to be increased by $60 million from $112 million to $172 million.

39.     However, "[i]n consultation with BBSI's executives and independent auditor," Moss Adams LLP ("Moss Adams"), Defendant Miller determined not to use Sherman's estimate for the first quarter of 2014 "pending further analysis."  To that end, "following the first quarter [of 2014]," BBSI retained a second actuary, Willis Claims Audit Team ("Willis"), to conduct an analysis of specific claim reserves and the Company's overall workers' compensation liability, and the impact of the Company's reserving practices on overall liability, as of the end of the second quarter of 2014.  Miller signed BBSI's engagement letter with Willis.

40.     On April 29, 2014, BBSI issued a press release entitled "BBSI Reports First Quarter 2014 Financial Results" (the "April 29, 2014 Press Release").  The next day, the Company hosted a conference call to discuss the April 29, 2014 Press Release.  During the call, Defendant Miller mentioned the reserve strengthening process:

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

Related to workers' compensation, in the quarter we continued to make progress on our reserve strengthening process in which we estimate to be completed in the next 60 days.  This has been a process focused on taking dollars that have been accrued in IBNR into incurred on individual claims, which is intended to get us closer to an ultimate expected level on all claims.

41.     On May 12, 2014, BBSI filed with the SEC a Form 10-Q for the quarter ended March 31, 2014 (the "First Quarter 2014 10-Q"), which was signed by Defendant Miller.  Note 4 to the financial statements reported in the First Quarter 2014 10-Q disclosed that the Company's workers' compensation claims liabilities for the quarter was $120.1 million, consisting of Total IBNR of $69.2 million and Case Reserve of $50.9 million.  From the previous quarter, the workers' compensation claims liabilities increased by $7.7 million and Total IBNR decreased by $0.4 million, for a total change of $8.1 million; for the same time period, Case Reserve also increased by $8.1 million.  As noted, pending Willis' analysis, the Company determined not to record a workers' compensation liability equal to Sherman's estimate in the first quarter of 2014.

42.     The First Quarter 2014 10-Q contained disclosures regarding the Company's internal controls over financial reporting that were similar to the disclosures contained in the First Quarter 2013 10-Q, and Second Quarter 2013 10-Q.  The First Quarter 2014 10-Q also alluded to the retention of the second actuary when it stated that: "In order to further refine our reserving practices, the Company is in the process of engaging an additional actuarial firm to assist management in gaining an enhanced understanding of actuarial valuation in light of the Company's specific workers' compensation claims experience."

43.     At the end of the second quarter of 2014, Sherman and Willis both estimated that BBSI was significantly under-reserved for its workers' compensation liability.  Despite utilizing different analyses, Sherman and Willis estimated that BBSI's workers' compensation liabilities at the end of the second quarter of 2014, were, respectively, $206 million (approximately $86 million higher than the Company's reserve at the end of the prior quarter) and $213.5 million (approximately $93 million higher).

44.     At the end of the second quarter of 2014, Defendant Miller prepared a memorandum for the Audit and Compliance Committee ("Audit Committee") of the Company's Board with his analysis of the Company's workers' compensation liability.  Miller's memorandum again rejected

Sherman's analysis and altogether omitted Willis' analysis.  Miller did not provide Willis' analysis to the Audit Committee or discuss it with them, nor did he provide Willis' analysis to the Company's auditor Moss Adams.

45.     On July 29, 2014, BBSI issued a press release entitled "BBSI Reports Second Quarter 2014 Financial Results (the "July 29, 2014 Press Release").  The next day, the Company hosted a conference call to discuss the July 29, 2014 Press Release.  During the call, Defendant Miller stated:

> [W]e are continuing to progress through our reserves strengthening process where we have moved dollars within our workers' comp liability from the accrued IBNR bucket into specific open claims with the intent on accelerating claim development in order to move it closer to an ultimate expected level on all open claims . . . .
>
> As part of this process we have engaged an outside consulting firm who will soon be reviewing a sample of these strengthened claims to evaluate the sufficiency of the new estimated claim values as well as assist management in gaining an enhanced understanding of trends within our claim population.

46.     On August 8, 2014, BBSI filed with the SEC a Form 10-Q for the quarter ended June 30, 2014 (the "Second Quarter 2014 10-Q"), which was signed by Defendant Miller.  The Second Quarter 2014 10-Q disclosed the following regarding BBSI's recent workers' compensation claims administration and reserve practices:

> We have undertaken a number of steps during the past two years to improve our workers' compensation claims administration and reserving practices.  These steps include hiring additional claim administrators in response to our business growth, and working to close litigated claims more quickly.  In order to further refine our reserving practices, the Company has engaged an additional actuarial firm to assist management in gaining an enhanced understanding of actuarial valuation in light of the Company's specific workers' compensation claims experience.

47.     Note 5 to the financial statements reported in the Second Quarter 2014 10-Q noted that BBSI's estimated future liability for unsettled workers' compensation claims liabilities was $122.5 million, consisting of Total IBNR of $29.9 million and Case Reserve of $92.6 million. Notably, BBSI reported a *181% increase* in Case Reserves and a *231% decrease* in Total IBNR relative to the previous quarter.  The changes in Case Reserves and Total IBNR stand in stark contrast to the mere *1.9% increase* to the Company experienced in its overall estimated future liability for unsettled workers' compensation claims relative to the previous quarter.  From the previous quarter, the workers' compensation reserve increased by $2.4 million and Total IBNR decreased by $39.3 million, for a total change of $41.7 million; for the same time period, Case Reserve also increased by

$41.7 million.  Instead of relying on Sherman's or Willis' estimates, Defendant Miller recorded BBSI's workers' compensation liabilities based on his own calculations which did not take into account trends in BBSI's data, as required by Generally Accepted Accounting Principles ("GAAP").

48.      The Second Quarter 2014 10-Q contained disclosures regarding the Company's internal controls over financial reporting that were similar to the disclosures contained in the First Quarter 2013 10-Q, Second Quarter 2013 10-Q, and First Quarter 2014 10-Q.

49.      In the third quarter of 2014, Defendant Miller again received reports from Sherman and Willis actuaries which suggested large increases in the Company's workers' compensation reserve.  Miller finally shared some of Willis' analysis with Moss Adams, but did not explain when it was provided to him.  Miller initially contemplated using a lower number for BBSI's workers' compensation reserves, but after discussion with BBSI management and Moss Adams, the Company elected to use an actuarially-derived estimate.

50.      The truth about BBSI's workers' compensation reserves finally came to light on October 28, 2014 when the Company issued a press release disclosing that during the third quarter of 2014, it recorded an increase of $80 million to its workers' compensation reserve–a *71% increase* over its reserve balance as of December 31, 2013.

51.      The $80 million charge had a significant impact on the Company's financial statements, as BBSI reported a net loss of $37.8 million for the third quarter of 2014, as compared to net income of $9 million in the third quarter of 2013.  Following the Company's announcement of the $80 million charge, the price of BBSI's common stock plummeted from $44.04 to $18.11, *a 58.9% decrease.*

52.      In the third and fourth quarter of 2014, Defendant Miller took steps to conceal Willis' work from Moss Adams.  Indeed, in two memoranda Miller sent to Moss Adams, Miller falsely asserted that BBSI retained Willis in the third quarter of 2014, rather than earlier in the year.

**Miller Sold Significant Amounts of BBSI Common Stock at Artificially Inflated Prices**

53.      Defendant Miller had concerns regarding the adequacy of the Company's workers' compensations reserves as early as the second half of 2013, but failed to disclose such concerns to the Company's stockholders or the investing public.

54.     Armed with knowledge of the issues regarding the inadequacy of the Company's workers' compensation reserves, Defendant Miller sold significant amounts of BBSI common stock:

| Name | Transaction Date | Shares Sold | Price Per Share | Proceeds |
|------|------------------|-------------|-----------------|----------|
| James D. Miller | July 29, 2013 | 16,293 | $68.40 | $1,114,441.20 |
| | July 30, 2013 | 19,007 | $67.54 | $1,283,732.78 |
| | **Total** | **35,300** | | **$2,398,173.98** |

55.     Defendant Miller's sales in July 2013 were in connection with the exercise of options to purchase 35,300 shares of BBSI common stock, which constituted approximately 70% of his exercisable options.  Prior to July 2013, Miller last sold BBSI common stock in March 2007.

56.     In addition, Defendant Miller sold shares in July 2014 before the Company disclosed the $80 million workers' compensation reserve charge:

| Name | Transaction Date | Shares Sold | Price Per Share | Proceeds |
|------|------------------|-------------|-----------------|----------|
| James D. Miller | July 1, 2014 | 1,049 | $48.93 | $51,327.57 |
| | July 11, 2014 | 1,049 | $55.02 | $57,715.98 |
| | **Total** | **2,098** | | **$109,043.55** |

57.     BBSI maintains a Board-approved stock repurchase program that authorizes the repurchase of the Company's shares from time to time in open market purchases.  After the commencement of the "reserve strengthening" process in July 2013, but prior to the announcement of the $80 million workers' compensation reserve charge on October 28, 2014, Defendant Miller caused BBSI to make the following repurchases at materially inflated prices:

| Date | Shares Repurchased | Average Price | Cost |
|------|--------------------|--------------|------|
| June 2014 | 19,900 | $49.82 | $991,418.00 |
| September 2014 | 16,501 | $39.92 | $658,719.92 |
| October 2014 | 28,000 | $39.95 | $1,118,600.00 |
| **Total** | **64,401** | | **$2,768,737.92** |

**Miller Misstated BBSI's Workers Compensation Expense and BBSI's Federal and State Unemployment Taxes**

58.     In addition to misstating the Company's workers' compensation reserves, Defendant Miller manipulated BBSI's workers' compensation expenses, and federal and state unemployment taxes ("FUTA" and "SUTA," respectively).

59.     Rather than record the Company's workers' compensation expense to reflect Sherman's overall estimate of liability, Defendant Miller instead dispersed the increased expense amount across several unrelated expense accounts, including payroll taxes, through falsified journal entries.  By misclassifying expenses, Miller and BBSI were able to report workers' compensation

COMPLAINT
SALINAS V. MILLER, ET AL.
-14-
**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

expenses that were in line with historical trends, when in fact they knew BBSI's workers' compensation expenses were increasing as a percentage of revenue.

60.     In addition to manipulating BBSI's workers' compensation expense, Defendant Miller manipulated the period in which BBSI recognized certain FUTA and SUTA expenses.  Specifically, instead of recognizing the FUTA and SUTA expenses in the periods they were incurred, as required by GAAP, Defendant Miller spread the approximately $3 million expense over several quarters in 2014.

**The Truth About Miller's Misconduct Emerges**

61.     Defendant Miller's misconduct began to emerge on November 9, 2015 when the Company filed a Current Report on Form 8-K (the "November 9, 2015 8-K") disclosing that, on November 4, 2015, the Audit Committee received written notice from Moss Adams that the Company's Second Quarter 2014 10-Q "can no longer be relied upon" based upon Moss Adams having not been provided with Willis' analysis in the second quarter of 2014.  Specifically, the November 9, 2015 8-K disclosed that:

> In connection with this notice, Moss Adams requested that the Audit Committee conduct an independent investigation regarding the Company's workers' compensation expense reserve as reported in its Form 10-Q for the quarter ended June 30, 2014 (the "June 30, 2014 workers' compensation reserve"). ***Moss Adams stated that it has become aware of information indicating that an illegal act has or may have occurred with respect to the June 30, 2014 workers' compensation reserve in connection with Moss Adams not having been provided with available information regarding the Company's June 30, 2014 workers' compensation expense reserve in the course of Moss Adams' review of the Company's financial statements in the 2014 second quarter Form 10-Q.***
>
> * * *
>
> In May 2014, the Company engaged an actuarial consultant to assist management in assessing the Company's practices in handling workers' compensation claims and establishing case reserves, evaluating its workers' compensation liability, and working with its independent actuary of record. ***The Audit Committee believes that the notice received from Moss Adams was triggered by Moss Adams' becoming aware that the consultant's analysis had not been provided to Moss Adams in connection with its review of the financial statements included in the 2014 second quarter Form 10-Q.***

(Emphasis added).

62.     On March 9, 2016, BBSI filed with the SEC a Current Report on Form 8-K (the "March 9, 2016 8-K") disclosing that, on March 4, 2016, the Audit Committee determined that all of the Company's financial statements (i) for the fiscal years ended December 31, 2012, 2013 and 2014,

1  and each respective quarter in those fiscal years, and (ii) as of and for the quarters ended March 31

2  and June 30, 2015, must be restated and should not be relied upon.

3        63.     In connection with this determination, the March 9, 2016 8-K disclosed that, on March

4  3, 2016, Defendant Miller met with the Audit Committee and "reported that he had made unsupported

5  journal entries in the Company's financial records during each calendar quarter of 2013," the effect

6  of which was "to overstate direct payroll costs by a total of approximately \$1.4 million . . . payroll

7  taxes and benefits expenses by a total of approximately \$9.7 million, and selling, general and

8  administrative expenses by a total of approximately \$0.9 million, and to understate workers'

9  compensation expense by a total of approximately \$12.0 million . . . ."  According to the March 9,

10  2016 8-K, BBSI fired Miller on March 4, 2016.

11        64.     On May 26, 2016, BBSI filed an Annual Report on Form 10-K containing restated

12  financial statements for the periods ending December 31, 2011, 2012, 2013 and 2014, and for each

13  of the first three quarters of 2015.  In those restated results, BBSI reported an additional \$15.8 million

14  in workers' compensation expense during 2012 and 2013, reduced its 2013 net income by \$2.2

15  million (a reduction of over 10% from the previously-issued 2013 results), and recorded the \$80

16  million reserve charge in the second quarter of 2014 instead of the following quarter.

17  **Litigation Involving the DOJ, SEC and BBSI**

18        65.     Defendant Miller's misconduct prompted investigations by the DOJ and SEC which

19  culminated in the filing of civil and criminal enforcement proceedings against Miller and the

20  Company.

21        66.     On September 19, 2018, the DOJ commenced the DOJ Action against Defendant

22  Miller by issuing the Indictment charging Miller with issuing false certifications in connection with

23  the First Quarter 2013 10-Q, Second Quarter 2013 10-Q, Third Quarter 2013 10-Q, and 2013 10-K.

24  Specifically, the Indictment alleges that Defendant Miller:

25        [K]nowingly and willfully certified falsely that the periodic reports fully complied
26        with the requirements of Sections 13(a) and 15(d) of the Securities Exchange Act
      of 1934 and that the periodic reports fairly presented, in all material respects, the
      financial condition and results of operations of BBSI, despite knowing that these
27        certifications were false because: (1) the reports did not comply with generally
      accepted accounting principles; (2) [Miller] had fraudulently misclassified certain
28        workers' compensation expenses as payroll and other expenses, and had concealed

COMPLAINT                                                                          -16-
*SALINAS V. MILLER, ET AL.*

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

the misclassification; and (3) [Miller] had clandestinely circumvented BBSI's internal controls and BBSI's internal controls were not effective in preventing that circumvention . . . .

67.     The following day, the SEC filed the SEC Complaint against Defendant Miller for violations of the federal securities laws.  The SEC Complaint alleged that:

> From 2012 through 2014, Miller engaged in a number of fraudulent accounting practices to mask negative trends in BBSI's workers' compensation exposure including (1) misclassifying expenses to understate BBSI's recorded workers' compensation expense, (2) improperly recognizing certain federal and state unemployment tax expenses over multiple periods rather than in the period incurred, and (3) underreporting BBSI's workers' compensation liability by, in part, concealing the existence of a second actuarial report that corroborated BBSI's independent actuary's view that BBSI needed to increase its workers' compensation liability by $80 million.

68.     The SEC Complaint also alleged that, in addition to the SEC filings challenged in the Indictment, Defendant Miller submitted false certifications in connection with the 2012 10-K, First Quarter 2014 10-Q, and Second Quarter 2014 10-Q.

69.     Also on September 20, 2018, the SEC Order was issued in the matter titled *In the Matter of Barrett Business Services, Inc. and Mark Cannon, CPA*.  The SEC Order found that BBSI's accounting practices "violated the anti-fraud, books and records, periodic reporting and internal accounting control provisions of the federal securities laws," and that Mark Cannon, the Company's former controller, violated the books and records provision by improperly approving certain of Miller's falsified journal entries.  In connection with the SEC Order, BBSI agreed to pay a $1.5 million fine, and to cease and desist from committing or causing any violations and future violations of the federal securities law.

70.     On November 2, 2018, BBSI filed the BBSI Complaint against Defendant Miller to recoup over $1.6 million in costs and expenses the Company had advanced Miller under the terms of an indemnification agreement.  According to the BBSI Complaint, "[a]s CFO of BBSI, Miller engaged in a number of improper accounting practices related to BBSI's workers' compensation liability expense."  The Company also asserted that: "Miller's admissions, the indictment in the DOJ Action, and the findings in the SEC Order establish that Miller acted with bad faith or active or deliberate dishonesty in committing acts that gave rise to the SEC investigation," and that Defendant

COMPLAINT
*SALINAS V. MILLER, ET AL.*
-17-
**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Miller received improper benefits through his "receipt of bonuses and other incentive-based compensation between 2012 and 2014, and through the sale of BBSI stock in 2013."[5]

## MILLER'S BREACHES OF DUTY

71.     Defendant Miller breached his duties by, among other things: (i) knowingly causing the Company to understate its estimated workers' compensation liabilities; (ii) knowingly causing the Company to materially overstate its net income; (iii) abdicating his responsibility to make a good faith effort to oversee the Company's operations and reserve practices; (iv) knowingly disseminating false and misleading information regarding the Company's financial condition; (v) falsely disclosing that the Company had adequate workers' compensation reserves when he knew it did not; and (vi) causing the Company to repurchase stock at materially inflated prices.  Furthermore, Defendant Miller collectively sold approximately $2.5 million of BBSI common stock based on his knowledge of material nonpublic information regarding the adequacy of the Company's reserves, which constituted a breach of his duties and unjust enrichment.

72.     As a direct and proximate result of the foregoing violations of law, the Company has sustained and will continue to sustain damages, including, but not limited to, the costs and expenses incurred in connection with:

a.     the reserve strengthening process, reserve study and consultant(s);

b.     the SEC and DOJ investigations;

c.     the Company's internal investigations;

d.     the restatement and the remediation of the myriad material weaknesses relating to the Company's reserve practices and internal controls over financial reporting;

e.     stock repurchases;

f.     the compensation paid to Defendant Miller while the Company's workers' compensation reserves were inadequate and the Company's financial reports were inaccurate and misstated; and

g.     the renegotiating of the Company's loans with its lenders, including the $40 million loan taken to satisfy the Company's workers' compensation reserve funding requirements.

---

[5] On January 4, 2019, the Company voluntarily dismissed its claims against Miller without prejudice.

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

73.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

74.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress Defendant Miller's breaches of duties and other violations of law.

75.     Plaintiff will adequately and fairly represent the interests of BBSI and its stockholders in enforcing and prosecuting its rights.

76.     Plaintiff is an owner of BBSI common stock and was an owner of BBSI stock at all times relevant to Defendant Miller's wrongful course of conduct alleged herein.

77.     On February 26, 2015, Plaintiff made a demand on the Board to commence this action (the "Demand") against Defendant Miller and certain other current and former directors and officers of the Company.[6]

78.     On May 4, 2015, BBSI's counsel sent a letter to Plaintiff's counsel rejecting the Demand.[7]

79.     The May 4, 2015 letter contained numerous omissions.  Among other things, the May 4, 2015 letter failed to disclose:

a.      That the counsel that investigated and responded to the Demand, Miller Nash Graham & Dunn ("Miller Nash") was (1) concurrently representing BBSI, BBSI President, Chief Executive Officer and director Michael L. Elich ("Elich") and Defendant Miller in a securities class action in federal court relating the Company's accounting fraud titled *In re Barrett Business Services Securities Litigation*, Case No. C14-5884 BHS (W.D.Wa.) (the "Class Action"), and (2) long-time counsel to the Company, having served as the Company's counsel since 1994.

b.      Whether Miller Nash interviewed any BBSI personnel other than the directors and officers named in the Demand.

c.      Any specificity as to the universe of documents that constituted the "more than five thousand pages of documents related to actuarial analysis and resulting increase in reserves" that was purportedly reviewed by "others in [the Miller Nash] firm."

d.      Any action taken by the Board in response to the Demand.

---

[6] A true and copy of Plaintiff's Demand is attached hereto as Exhibit E.

[7] A true and correct copy of the May 4, 2015 letter is attached hereto as Exhibit F.

COMPLAINT
*SALINAS V. MILLER, ET AL.*                                    -19-

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

e.   Whether the Board formed a special committee to investigate and respond to the Demand.

f.   Whether BBSI's investigation resulted in the preparation of a written report.

80.   On May 8, 2015, Plaintiff's counsel sent a letter to counsel for BBSI.[8]  The May 8, 2015 letter requested the following information and documents from BBSI:

1.   Please state whether BBSI's board of directors (the "Board") appointed a committee to investigate the Demand, and if so, please identify the members of the committee and provide the Board resolution authorizing the committee and the minutes of the Board meeting at which the resolution was approved.

2.   Please state whether the Board or a committee of the Board decided to retain your firm to investigate the Demand, and if so, please provide the resolution or other document evidencing the decision and the minutes of the Board or committee meeting at which the decision was made or approved.

3.   Please state whether BBSI's investigation resulted in the preparation of a written report, and if so, please provide the report.

4.   Please state whether the Board or a committee of the Board resolved to refuse the Demand, and if so, please provide the resolution and the minutes of the Board or committee meeting at which the resolution was approved.

81.   On May 29, 2015, BBSI's counsel sent a letter to Plaintiff's counsel.[9]  The May 29, 2015 letter advised that:

1.   The Board of Directors of BBSI (the "Board") authorized an internal investigation of the Demand at its meeting held on March 6, 2015.  A redacted copy of the meeting minutes for that meeting is attached.  As noted, no committee was appointed.

2.   Same as #1.

3.   No written report was prepared.

4.   Attached is a redacted copy of the minutes of the Board at its meeting held on April 27, 2015 regarding action on the Demand.

82.   The correspondence from BBSI's counsel and the minutes from the meetings of BBSI's Board on March 6, 2015 and April 27, 2015 confirm that the Board failed to conduct an

---

[8] A true and correct copy of the May 8, 2015 letter is attached hereto as Exhibit G.

[9] A true and correct copy of the May 29, 2015 letter is attached hereto as Exhibit H.

COMPLAINT                                                                    -20-
SALINAS V. MILLER, ET AL.

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1  independent and good faith investigation of the Demand and respond to it in the best interests of the

2  Company.

3        83.    The minutes from the meeting of the Board on March 6, 2015 (the "March 6, 2015

4  Board Meeting" or "March 6, 2015 Board Minutes") demonstrate that BBSI's purported

5  "investigation" was neither reasonable nor conducted in good faith.

6        84.    Two of the five directors present at the March 6, 2015 Board Meeting were individuals

7  named in the Demand.  Defendant Miller was also present at the meeting.  The presence of these

8  conflicted and interested individuals at the meeting raises suspicion as to the reasonableness and good

9  faith of any action taken by the Board at the March 6, 2015 meeting.

10        85.    The March 6, 2015 Board Minutes indicate that Tom Sand, "a senior litigator at Miller

11  Nash who is leading the team that is assisting the Company in defending against the class action

12  litigation filed in federal court in Tacoma, Washington," discussed the Demand with the Board and

13  advised as to what options the Company could take in response to the Demand.  Specifically, Mr.

14  Sand outlined the following possible responses to the Demand:

> One possibility is to take no action [redacted].  A second alternative would be to
> retain Miller Nash to perform an internal investigation.  A Miller Nash attorney
> would conduct brief interviews of each director and officer who sold shares in
> 2013 or 2014 and prepare a response to the shareholder's counsel.  The third option
> is to appoint a special litigation committee that would engage separate independent
> counsel to perform an investigation.

      86.    Mr. Sand aptly described the proposed Miller Nash internal investigation as "brief"

because it would encompass nothing but interviews of "each director and officer who sold shares in

2013 or 2014."  The proposed investigation would not encompass any of the following activities

which would have been expected to be part of a reasonable, good faith investigation: 1) a review of

all claims presented in the Demand, not just the insider trading claims; 2) a review of documents

relevant to the claims presented in the Demand; and 3) interviews of witnesses other than those

directors and officers "who sold shares in 2013 or 2014."  Further, the reference to "separate

independent counsel" in connection with the possible appointment of a special litigation committee

is an implicit acknowledgement that Miller Nash, the same firm representing BBSI, Elich and

Defendant Miller in the Class Action, was not "independent" for purposes of considering the Demand.

COMPLAINT
SALINAS V. MILLER, ET AL.
-21-
TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

87.    Mr. Nash left the meeting after answering questions from directors regarding the Demand, and "following additional discussion" the directors present, which included several directors named in the Demand, "unanimously approved," in the presence of Defendant Miller, "the engagement of a Miller Nash attorney to conduct an internal investigation into the matters alleged in the [Demand] and to report to the Board regarding the investigation and his or her conclusions and recommendations." Notably, in reaching this determination, the Board knowingly eschewed 1) the appointment of a special litigation committee and engagement of independent counsel to investigate the Demand; 2) the preparation of a written report by the investigating individual(s); and 3) a vote of disinterested directors in deciding how the Board would respond to the Demand.  Rather, the Board elected to engage the same law firm that was defending the Company, Elich and Defendant Miller in the Class Action to investigate and make recommendations regarding the allegations and claims in the Demand, which the Board acknowledged were substantially similar to those in the Class Action and were being brought against some of same defendants as in the Class Action.  In other words, the Board chose to have Miller Nash "investigate" its own clients regarding the very same conduct for which Miller Nash was defending those clients in the Class Action.

88.    The minutes from the meeting of BBSI's Board on April 27, 2015 (the "April 27, 2015 Board Meeting" or the "April 27, 2015 Board Minutes") further demonstrate that BBSI's purported "investigation" was neither reasonable nor conducted in good faith.

89.    As with the March 6, 2015 Board Meeting, the composition of those present at the April 27, 2015 Board Meeting is questionable, at best.  Three of the six directors present at the April 27, 2015 meeting were individuals named in the Demand.  Defendant Miller, who was also a named defendant in the Class Action, and another executive named in the Demand, were also in attendance. The presence of these conflicted and interested individuals at the meeting raises suspicion as to the reasonableness and good faith of any action taken by the Board at the April 27, 2015 meeting.

90.    The April 27, 2015 Board Minutes indicate that Mr. Kimball Ferris of Miller Nash investigated the Demand on behalf of BBSI.  At the April 27, 2015 Board Meeting, "Mr. Ferris stated that the Board, by action taken at its March 6, meeting, had engaged [Miller Nash] to conduct an internal investigation to provide an objective evaluation of the allegations in [the Demand]," and that

Mr. Ferris "was selected to perform the investigation separate from and independently of the Company's trial counsel in the [Class Action]."

91.     Contrary to the assertion in the April 27, 2015 Board Minutes, no Miller Nash attorney could be "objective" in evaluating the claims alleged in the Demand because Miller Nash was concurrently defending the Company, Elich and Defendant Miller in the Class Action.  Miller Nash's participation in the "investigation" of the Demand constituted a conflict of interest stemming from the ethical duties Miller Nash owed to defending the interests of Elich and Defendant Miller in the Class Action.

92.     The April 27, 2015 Board Minutes further reveal the shoddy, half-hearted investigation of the Demand that Miller Nash performed for the Company.  The April 27, 2015 Board Minutes state that Mr. Ferris "reviewed each Form 4 reporting sales by officers and directors during 2013 and 2014 before conducting the interviews [with said officers and directors]," and that "[i]nterview questions focused on the individual's knowledge about developments at the Company at the time of the sale(s), conversations that the individual had with others regarding the sales, and the individual's reasons for engaging in the sales."  Thus, Miller Nash did not review any documents other than the Form 4s prior to conducting the interviews, and the interviews focused only on the allegedly improper stock sales committed by the interviewees and omitted any discussion as to any other claim presented in the Demand.

93.     The April 27, 2015 Board Minutes further state that "[t]he reason cited for making changes in the Company's practices for recording workers' compensation reserves was consistently that such changes were intended to improve the Company's business, including with respect to estimating worker's compensation expense and pricing strategies," and that  "[m]anagement believed that an orderly process was essential to achieving an accurate assessment of the effects of the changes in claims handling and estimation."  The minutes do not state the bases from which Mr. Ferris reached these conclusions.

94.     Further, a key allegation in the Demand is that the minutes clearly indicate that Mr. Ferris conducted no investigation into whether the reserves were properly and timely recorded.  The April 27, 2015 Board Minutes further state that "[t]he responses provided [by the interviewees]

COMPLAINT                                                               -23-
SALINAS V. MILLER, ET AL.

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

demonstrated that sales of shares of the Company's common stock were undertaken for personal financial reasons, including the imminent expiration of stock options and the tax obligations associated with stock option exercises and vesting of restricted stock units."  However, rather than conducting an independent investigation, including, *inter alia*, interviewing other relevant witnesses and reviewing documents other than the Form 4s, Miller Nash instead chose to accept the directors' and officers' word for why they purportedly engaged in the improper stock sales alleged in the Demand and conducted no critical examination of the sellers' explanations.

95.     Since he conducted essentially no investigation, it is no surprise that "Ferris found no evidence of that the Company's officers or directors had breach their [ ]duties," and "no evidence of trading on material nonpublic information."

96.     Lastly, the April 27, 2015 Board Minutes state that several directors named in the Demand purportedly recused themselves from the vote, and that a group of purportedly non-conflicted directors approved Miller Nash's recommendation.  However, none of these directors which recused themselves from the vote, or Defendant Miller and another BBSI executive named in the Demand, left the meeting during the vote, which could have influenced the affirmative votes cast by the purported non-conflicted directors.

97.     The correspondence from BBSI's counsel, the March 6, 2015 Board Minutes and April 27, 2015 Board Minutes, and events which have transpired since the Board hastily determined to reject the Demand (such as the Indictment, SEC Complaint, SEC Order and BBSI Complaint) confirm that the Board failed to undertake an independent and good faith investigation of the Demand and respond to it in the best interests of the Company.  Accordingly, Plaintiff is entitled to proceed with the prosecution of the claims asserted herein.

## COUNT I

### Breach of Duties

98.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99.     As alleged herein, Defendant Miller owed the Company the fiduciary duties of loyalty and good faith to, among other things, act in furtherance of the best interests of the Company and its

stockholders so as to benefit all stockholders equally and not in furtherance of his personal interest or benefit.

100.     As alleged herein, Defendant Miller breached his duties of loyalty and good faith by: (i) knowingly causing the Company to understate its estimated workers' compensation liabilities; (ii) knowingly causing the Company to materially overstate its net income; (iii) abdicating his responsibility to make a good faith effort to oversee the Company's operations and reserve practices; (iv) knowingly disseminating false and misleading information regarding the Company's financial condition; (v) falsely disclosing that the Company had adequate workers' compensation reserves when he knew it did not; and (vi) causing the Company to repurchase stock at materially inflated prices.

101.     Defendant Miller also breached his duties of loyalty and good faith by selling significant amounts of BBSI common stock at artificially inflated prices and receiving improper proceeds from said sales based on his knowledge of the inadequacy of the Company's workers' compensation reserves.

102.     As a direct and proximate result of Defendant Miller's breaches of duties, the Company has sustained substantial damages, as alleged herein.

## COUNT II

### Unjust Enrichment

103.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as if fully set forth herein.

104.     Based on his knowledge of the inadequacy of the Company's workers' compensation reserves, Defendant Miller sold significant amounts of BBSI common stock at artificially inflated prices and received improper proceeds from said sales.  Defendant Miller is thus in possession of money and other property which, in equity and good conscience, should be returned to the Company.

105.     Despite his perpetration of a pervasive accounting fraud, Defendant Miller received substantial performance-based compensation and bonuses for fiscal years 2011 through 2015. Defendant Miller is thus in possession of money and other property which, in equity and good conscience, should be returned to the Company.

COMPLAINT
*SALINAS V. MILLER, ET AL.*
-25-
TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

106.    To remedy Defendant Miller's unjust enrichment, the Court should enter an order compelling him to disgorge to the Company: (1) the proceeds he has received from the sale of BBSI common stock at artificially inflated prices; and (2) the performance-based compensation and bonus proceeds he has received from BBSI while the Company's workers' compensation reserves were inadequate and the Company's financial reports were inaccurate and misstated.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment as follows:

A.    Awarding the Company the amount of damages it sustained as a result of Defendant Miller's breaches of duties;

B.    Ordering Defendant Miller to disgorge to the Company the proceeds he received from his sale of BBSI common stock at artificially inflated prices;

C.    Ordering Defendant Miller to disgorge to the Company the performance-based compensation and bonus proceeds he received from BBSI while the Company's workers' compensation reserves were inadequate and the Company's financial reports were inaccurate and misstated;

D.    Granting appropriate relief to remedy Defendant Miller's breaches of duties;

E.    Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury for the Counts above as to all issues so triable.

DATED: May 7, 2019                          Respectfully submitted,

**TOUSLEY BRAIN STEPHENS PLLC**

*s/ Jason T. Dennett*
Jason T. Dennett, WSBA# 30686
Email:  jdennett@tousley.com

*s/ Cecily C. Shiel*
Cecily C. Shiel, WSBA# 50061
Email:  cshiel@tousley.com

1700 Seventh Avenue
Suite 2200
Seattle, WA 98101
Tel: (206) 682-5600
Fax: (206) 682-2992

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
Eric Zagar *(to be admitted pro hac vice)*
Christopher M. Windover (*to be admitted pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 776-7056
Email: ezagar@ktmc.com
         cwindover@ktmc.com
*Attorneys for Plaintiff*